Antonia Cabassa viuda de Fajardo, Rosalinda y Emilia Fajardo Dávila, peticionarias, *v.* Corte de Distrito de Mayagüez, Hon. Charles E. Foote, Juez y José A. Fajardo Dávila, demandados.

No. 984.—*Sometido:* Julio 16, 1934. *Resuelto:* Julio 28, 1934.

*José A. Poventud* y *Miguel A. García Méndez,* abogados de la peticionaria Sra. Cabassa Vda. de Fajardo; *C. Ruiz Nazario,* abogado de Rosalinda y Emilia Fajardo Dávila; *Oscar Souffront* y *A. Ortiz Toro,* abogados del promovente en el pleito principal y de varios hermanos más de éste.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

José Ángel Fajardo Dávila solicitó de la Corte de Distrito de Mayagüez la lectura y protocolización de un documento que según se alega constituye el testamento ológrafo de don Mateo Fajardo Cardona, fallecido en la ciudad de Mayagüez el día 6 de febrero de 1934. Se alegó en la solicitud que el peticionario ignoraba hasta el día 27 de junio de

1934 que su padre Mateo Fajardo Cardona hubiese otorgado testamento, pero que hallándose en dicho día en las oficinas de la Central Eureka examinando, buscando y revisando todos los papeles y documentos que se encontraban en tal oficina en busca de aquéllos que pudieran tener relación con su finado padre don Mateo Fajardo Cardona, por haber sido requerido para ello por el Lic. Miguel Ángel García Méndez, abogado de doña Antonia Cabassa Texidor, y mientras hacía tal búsqueda en dicho día 27 de junio de 1934, encontró un sobre amarilloso pegado, que mide 12 pulgadas de largo por 9 de ancho, cuyo sobre tiene en su esquina superior izquierda escrito con lápiz, de puño y letra del causante, lo siguiente: "José A. Fajardo" y debajo la siguiente palabra: "entréguesele"; que el peticionario procedió a abrir dicho sobre habiéndose encontrado dentro del mismo ocho hojas de papel de escrituras escritas con tinta de puño y letra del causante don Mateo Fajardo Cardona por ambas caras con excepción de la última, las que constituyen el testamento ológrafo de dicho Mateo Fajardo Cardona fechado en la ciudad de Mayagüez, Puerto Rico, el día veintiseis de abril del año mil novecientos veintiseis, encontrándose dicho documento doblado en dos y teniendo en la parte posterior de la última carilla escrito con lápiz la palabra "testamento" de puño y letra del propio testador y encontrándose todas y cada una de las páginas de dicho testamento firmadas con la firma auténtica del causante testador don Mateo Fajardo Cardona.

Solicitó el peticionario la citación de los hijos del Sr. Mateo Fajardo Cardona, y de su viuda, para que compareciesen el día que la corte señalase a fin de proceder a la identificación, lectura y protocolización del testamento una vez cumplidos los requisitos de ley. En 5 de julio de 1934 dióse principio a la vista de la referida solicitud, compareciendo el promovente José A. Fajardo Dávila y sus hermanos Mateo, Carlos y María Luisa Fajardo Dávila, asistidos de su abobado Oscar Souffront. La viuda de don Mateo Fajardo Cardona, doña Antonia Cabassa, compareció representada por

los letrados Miguel A. García Méndez y José A. Poventud, y las hijas de dicho causante, Rosalinda y Emilia Fajardo Dávila, comparecieron representadas por su abogado Clemente Ruiz Nazario.

El abogado Poventud impugna la jurisdicción de la corte para la identificación del pliego. Los abogados García Méndez y Ruiz Nazario hacen constar que comparecen sin someterse a la jurisdicción del tribunal en este procedimiento y únicamente a los fines de cumplir con la citación hecha por la corte.

El Sr. Ruiz Nazario manifiesta que como las partes que representa tienen derecho, de acuerdo con el último párrafo del artículo 642 del Código Civil, a hacer las observaciones oportunas sobre autenticidad del testamento, y sus clientes no han tenido oportunidad de revisar ese documento y hacer esas observaciones oportunas, solicita de la corte que declare un receso, para que pueda mostrarse dicho testamento a sus clientes a fin de que lo examinen y le instruyan respecto a él. El juez signó y rubricó el alegado testamento y ordenó su entrega por el secretario a los interesados para que lo examinen en su presencia. Luego procedióse a la práctica de la prueba. Aparecen declarando los testigos Alfredo Arnaldo Sevilla, César A. Gómez y Francisco Llavat, los cuales fueron interrogados por el abogado Oscar Souffront. Las notas taquigráficas tomadas durante la apertura y lectura del alegado testamento el día 5 de julio de 1934 no reflejan intervención alguna de parte de dichos interesados o de sus abogados durante el examen de los testigos.

La Sra. Antonia Cabassa viuda de Mateo Fajardo Cardona y Rosalinda y Emilia Fajardo Dávila, basándose en que en la vista de la solicitud no se les permitió hacer observaciones y repreguntas a los testigos, y en que la corte inferior se negó a consignar en los autos las objeciones y repreguntas de sus abogados, solicitaron de esta corte, en 6 de julio del corriente año, que se expidiera un auto de *certiorari* para revisar los procedimientos tramitados ante la Corte de Dis-

trito de Mayagüez. En 7 de julio esta corte expidió el auto solicitado.

Según aparece de las notas taquigráficas, los días 6 y 7, previo señalamiento de la corte, tuvo lugar la continuación de la vista. El abogado Sr. Ruiz Nazario hizo constar que en el momento oportuno solicitó a nombre de sus representadas que se les permitiera antes del examen de los testigos cotejar los documentos por medio de peritos calígrafos y hacer las alegaciones oportunas en cuanto a la autenticidad del documento, con vista del mismo, para que la corte permitiera hacerles varias preguntas a los peritos con respecto a la cuestión de autenticidad, y que la corte denegó y no permitió que constaran las observaciones del abogado en el acta de la vista ni la resolución dictada por el juez ni la excepción tomada por las partes. Asimismo hizo constar el Sr. Ruiz Nazario que la corte no permitió que se hicieran preguntas de índole alguna a los testigos que fueron ofrecidos por el promovente, Sres. Alfredo Arnaldo Sevilla, César A. Gómez y Francisco Llavat, y que se privó a las partes interesadas del derecho de repreguntar a dichos testigos sobre su capacidad e idoneidad para servir como tales y sobre si determinadas partes y palabras, cifras y guarismos que aparecen en el referido documento son o no aparentan ser escritas de puño y letra del testador. La corte hizo constar que lo manifestado por el abogado es un relato fiel de lo ocurrido durante la vista que se celebró el día anterior.

El abogado Sr. Poventud hizo suyas las manifestaciones del Sr. Ruiz Nazario y consignó, para que constaran en los autos, las observaciones que, según manifiesta, surgen "a simple vista de un ligero examen del papel presentado en este caso por el promovente, que se titula testamento ológrafo." Solicitó el Sr. Poventud que se permitiera a las partes representadas por él, por Ruiz Nazario y García Méndez repreguntar a los tres testigos de identificación "que declararon ya por parte del peticionario en este procedimiento." De primera intención la corte denegó la solicitud. Luego el

Sr. Souffront a nombre de sus representadas, manifestó que se allanaba a que se examinasen nuevamente los testigos en relación con las observaciones hechas por los interesados mediante una estipulación de todas las partes. El Sr. Poventud afirmó su derecho a repreguntar a los testigos y después de oídas las partes se dictó por el juez la siguiente resolución:

"La Corte ordena que sea anulado el testimonio dado por los tres testigos que declararon respecto a la firma y la letra del documento que se presentó como el testamento de don Mateo Fajardo Cardona, y que sean citados de nuevo los testigos para comparecer mañana a las nueve de la mañana. Esos testigos serán informados de todas las observaciones que se han hecho y que están consignadas en el récord, y entonces se repreguntará por las partes que se oponen."

Al día siguiente, 7 de julio, se modificó esta resolución en la siguiente forma:

"La corte va a enmendar su orden en cuanto a anular el testimonio dado por estos testigos. Eso queda en el récord, o sea el testimonio que ellos dieron cuando fueron examinados. Ahora se les va a permitir declarar respecto a las observaciones hechas por los abogados de las partes opositoras."

En la sesión celebrada el 6 de julio, el Sr. Ruiz Nazario hizo constar en los autos la presencia del químico don Ángel M. Pesquera y del perito calígrafo don Casto Vega, y solicitó el examen del alegado testamento a presencia de uno de los abogados de las partes y del secretario, a fin de hacer observaciones en cuanto a la autencidad y letra del mismo, estableciendo comparaciones con documentos indubitados del causante, para que la corte estuviese en condiciones de resolver. Se autorizó el examen de dicho documento en la mesa de los jurados.

Al reanudarse la sesión el día 7, el Sr. Poventud expuso que la corte había perdido su jurisdicción para proceder a la lectura del alegado testamento y a la práctica de las diligencias, por haber sido presentado el día 2 del mes de julio y haberse señalado el día 5 para la práctica de las diligencias,

a pesar de que el día 3 fué hábil y hubiera podido celebrarse la vista ese día.

■ Aunque esta cuestión jurisdiccional no ha sido discutida por los abogados de las peticionarias ni en su laborioso alegato ni en su argumentación oral ante esta corte, pasamos no obstante a resolverla porque se adujo en la solicitud y se planteó con insistencia en el tribunal inferior. La parte recurrida arguye que habiéndose radicado la solicitud de lectura, identidad y protocolización del testamento el día 2 de julio, no terminó hasta el 5 de dicho mes el plazo de dos días que determina el artículo 641 del Código Civil para el señalamiento de la práctica de las diligencias, porque el día 4 de julio, siendo festivo, tenía que ser excluído y no podía tomarse en consideración. Aunque la ley dispone que el señalamiento para la práctica de las diligencias se hará dentro del segundo día a más tardar, la corte no está privada de ejercitar su discreción para fijar dicho señalamiento o para prorrogarlo, cuando las circunstancias lo exijan. Como dijimos en *Más et al.* v. *Borinquen Sugar Co.,* 18 D.P.R. 309, esta facultad discrecional es inherente en los tribunales, pudiendo surgir causas de enfermedad, muerte, ausencia, incapacidad u otras semejantes, que hagan indispensable el señalamiento para una fecha posterior.

■■ Después de planteada la cuestión que antecede y de modificada la orden de la corte con respecto al testimonio de los testigos, se ordenó que se leyesen a los mismos las observaciones hechas por las partes. El Sr. Poventud ofreció observaciones adicionales. El Lic. Souffront expresó sus deseos también de hacer algunas observaciones. Se opuso el Sr. Poventud por entender que de acuerdo con la ley estas observaciones debe hacerlas el promovente a través de sus testigos. Se autorizó al Sr. Souffront a ofrecer sus observaciones.

Comenzose a practicar el examen de los testigos. Declaró en primer término el Lic. Alfredo Arnaldo Sevilla. El Sr. Poventud se encargó de examinar al testigo, cuya declaración

copiamos en parte para dar una idea del carácter de las objeciones, de la extensión del interrogatorio y de las razones en que se basó la corte para negar que se hiciesen ciertas preguntas:

"Lic. Poventud:

(Al testigo Sr. Arnaldo). Compañero Arnaldo, ¿usted dijo que conocía la firma del supuesto testador don Mateo Fajardo Cardona?

R. Sí, la conozco.

P. ¿Podría Ud. citar al Sr. Juez qué motivo tiene para eso?

R. He recibido la impresión de la firma de don Mateo durante muchísimos años y tengo la idea precisa de cuándo la firma es de él y cuándo no es de él.

P. ¿Ud. posee algún documento de él; Ud. es notario?

R. Sí, señor, muchos ha otorgado ante mí.

P. ¿Usted tiene esos documentos originales en su notaría?

R. Sí. señor.

P. ¿Ud. ha examinado este papel que le presentaron ayer?

R. Sí. señor.

P. Sírvase tomarlo en sus manos y fijarse en esa página que debe ser la primera.

R. Sí, página primera.

P. Mire a ver si observa escrituras en lápiz y en tinta . . .

Lic. Souffront: Para oponernos.

Hon. Juez: El testigo puede declarar respecto a la letra y la firma nada más.

Lic. Poventud: ¿Y sobre las observaciones nuestras . . . ?

Hon. Juez: No, él es testigo de la identidad de la firma y letra, nada más. Las raspaduras o algo así no tienen nada que ver. La Corte va a resolver de una vez para no presentar un sinnúmero de veces la cuestión. Él puede declarar solamente sobre la letra y la firma.

Lic. Poventud: ¿Y sobre las tachaduras?

Hon. Juez: No, si todo ha sido tachado no tiene que ver el testigo, si ha sido cambiado. Solamente si ésa es la letra y la firma. Eso vendrá en un pleito ordinario, pero en este momento es la letra y la firma del que otorgó el testamento.

Lic. Poventud: Pero lo que yo quiero saber es si esos números son del testador.

Hon. Juez: ¡Oh! sí, eso sí.

P. En la página primera, ¿hay un número ahí?

R.   Hay un número o algo que parece un número en la cabeza del pliego.

P.   ¿Escrito en qué?

R.   Con lápiz.

P.   ¿Y el resto del pliego?

R.   Está en tinta.

P.   ¿Ud. podría asegurar a la Corte si ese número es de puño y letra del testador?

R.   No lo puedo decir.

P.   ¿Y la palabra 'veinte' del día del mes que aparece en ese testamento?

R.   Y seis . . .

P.   ¿Quiere decirme las huellas? . . . ¿Podría decir el compañero si observa que la palabra 'veinte' correspondiente al día del mes está entre paréntesis, y si es de puño y letra del testador?

Lic. Souffront: Nos oponemos a la pregunta.

Hon. Juez: Si el 'veinte' es la letra de él.

P.   Sí, si el 'veinte' es la letra del testador.

R.   Sí, la palabra 'veinte' es del testador.

P.   ¿Y el paréntesis?

Lic. Souffront: Nos oponemos.

Hon. Juez: Sostenida la oposición.

Lic. Poventud: Tomamos excepción.

P.   Diga el compañero si puede observar a simple vista sobre la palabra 'veinte' correspondiente al año en ese testamento, línea 4, si hay algo escrito sobre ese vocablo . . .

Lic.   Souffront: Nos oponemos.

Hon. Juez: Sostenida la oposición.   La letra y la firma solamente.

Lic. Poventud: Pero si es su letra la palabra 'treinta' no quiero sugerirlo al testigo.

Hon. Juez: No, eso no, solamente la letra y la firma nada más.

Lic. Poventud: Tomamos excepción.

P.   Haga el favor de ver en la página 4, . . . ¿no tiene numeración?

R.   No, señor, no está numerada.

P.   Haga el favor de ver si observa la cifra '6,000' en tinta.

R.   Sí, señor, en tinta.

P.   ¿Qué observa sobre esa cifra?

Lic. Souffront: No, eso no.

Lic. Poventud: Yo no quiero sugerirle la contestación.

R.   El número es de Mateo.

P. ¿No observa el testigo (a los efectos del récord) algo escrito sobre un ocho?

Hon. Juez: No, eso no.

Lic. Poventud: Tomamos excepción.

P. Hágame el favor de ver el compañero las páginas 8 y 9.

R. Sí, señor.

P. Sírvase decir el testigo si hay alguna huella de tachadura en esa página.

Lic. Souffront: Para oponernos a la pregunta.

Hon. Juez: Sostenida la oposición. No es para el testigo.

Lic. Poventud: Tomamos excepción. En esta situación me parece que lo que procede es hacer constar en el récord que insistimos en hacer al testigo una pregunta sobre todas y cada una de las observaciones que nos autorizó la corte a dictar en este caso, y que según ya tratamos de demostrar son procedentes para con los testigos de identificación que se traigan.

Hon. Juez: La corte niega la moción.

Lic. Poventud: Tomamos excepción. ¿No nos permitiría la corte traer la prueba pericial?

Hon. Juez: ¡Oh! no, cuando llegue el momento, después de considerar todo, antes de dictar ninguna resolución si la Corte conviene que es dudoso el documento, entonces sí, a petición de las partes. Pero en este momento no se puede practicar esa prueba; eso depende si la corte es de opinión que procede.''

El Sr. Poventud hizo constar que había dado lectura al resto de las observaciones con el fin de interrogar al testigo y que la corte excluyó las preguntas al efecto formuladas. El juez admitió la exclusión de toda pregunta ''que no se refiriera a la firma y letra del testador.''

Basta lo expuesto para demostrar que la corte inferior limitó el interrogatorio del abogado Sr. Poventud a la letra y firma del alegado testador, impidiendo que se formulasen preguntas sobre otros particulares. Las peticionarias no se sienten satisfechas e insisten en que la resolución de la corte inferior limitando el interrogatorio les negó el derecho de ser oídas, la protección igual de las leyes y un debido proceso de ley. Así lo hicieron constar sus abogados al comparecer ante esta corte y así lo manifiestan en su alegato, por entender

que en la continuación de la vista que tuvo lugar los días 6 y 7, el tribunal *a quo* persistió en negarles el reconocimiento de sus derechos. En apoyo de sus conclusiones citan las disposiciones del Código Civil relacionadas con el testamento ológrafo y a los comentaristas Scaevola y Manresa. También se citan algunas decisiones de los tribunales americanos con el fin de demostrar que el objeto de la citación es ofrecer la oportunidad de comparecer, y ser oído y que si se niega una audiencia (*hearing*) la notificación carece de efecto para cualquier propósito. Los artículos 641, 642 y 643 del Código Civil, edición 1930, dicen así:

"Art. 641.—Presentado el testamento ológrafo, y acreditado el fallecimiento del testador, la corte de distrito procederá a su lectura en audiencia pública y en día y hora señalados al efecto, dentro del segundo día a más tardar, abriéndolo si estuviere en pliego cerrado, rubricándolo los jueces con el notario en todas las hojas, y comprobando acto continuo su identidad por medio de tres testigos que conozcan la letra y firma del testador, y declaren que no abrigan duda racional de hallarse el testamento escrito y firmado de mano propia del mismo.

"A falta de testigos idóneos, o si dudan los examinados, y siempre que la corte de distrito lo estime conveniente, podrá emplearse con dicho objeto el cotejo pericial de letras.

"Art. 642. Para la práctica de las diligencias expresadas en el artículo anterior, serán citados con la brevedad posible, el cónyuge sobreviviente, si lo hubiere, los descendientes y los ascendientes legítimos del testador, y en defecto de unos y de otros, los hermanos.

"Si estas personas no residieren dentro del distrito judicial o se ignorase su existencia, o siendo menores o incapacitados carecieren de representación legítima, se hará la citación al fiscal.

"Los citados podrán presenciar la práctica de dichas diligencias · y hacer en el acto, de palabra, las observaciones oportunas sobre la autenticidad del testamento.

"Art. 643.—Si la corte de distrito estima justificada la identidad del testamento, acordará que se protocolice, con copia certificada de las diligencias practicadas en los registros del notario que los interesados designen, por el cual se librarán las copias o testimonios que procedan, que constituirán título bastante para la inscripción, total o parcial, en el registro de la propiedad, de los bienes inmuebles en que

consista la herencia. Si no hubiese conformidad entre los interesados, o si el notario designado por éstos estuviere incapacitado por alguna de las causas que señala la ley notarial, entonces la corte designará libremente un notario que tenga oficina abierta en su distrito.

"Cualquiera que sea la resolución de la corte de distrito, se llevará a efecto, no obstante oposición, quedando a salvo los derechos de los interesados para ejercitarlos en el juicio que corresponda."

Scaevola, en sus Comentarios al Código Civil, tomo 12, páginas 400, 401 y 402, dice así:

"'*Observación oportuna*' sobre la autenticidad del testamento, puede incuestionablemente ser la que haga cualquiera de los referidos interesados alegando que dicho extremo no podrá de manera acertada comprobarse por medio de testigos o peritos, parientes próximos de alguno de los herederos o legatarios de cuota de importancia o que con los mismos mantengan relaciones de íntima y estrecha amistad, por ejemplo.

"El Juez, si ha de dictar el auto de aprobación o desaprobación del expediente con arreglo a su conciencia y al resultado verdad de las actuaciones, cual se lo encarga el art. 693 al ordenarle que acordará la protocolización '*si estima justificada la identidad del testamento*', no tendrá otro remedio que aquilatar, dentro de los límites, claro es, señalados a la tramitación general de expedientes de jurisdicción voluntaria, el valor de los elementos probatorios que se le propongan o que él, de oficio, aporte a los autos.

"Si lo contrario fuera doctrina legal, por desconocimiento inexcusable del Juzgado, y bajo la sola afirmación del presentante del testamento, que puede estar, como ya hemos dicho, interesado en la herencia y tener derechos contrapuestos respecto a los demás se practicarían, por mera rutina y como simple fórmula las diligencias de importancia y valor innegables, a que se refieren los artículos 690 a 693 de nuestro Código.

"Ya sabemos que el auto que ponga término al expediente de protocolización cabe sea revisado en el juicio declarativo que corresponda, con tramitación más solemne y garantizadora para unos y otros interesados. Pero, aun siendo esto cierto, y refiriéndose, como se refiere indudablemente, a otras exigencias del procedimiento, ¿va a ser materia baladí el acreditar la autenticidad del testamento ológrafo, cuando esta justificación debe tener fundamental importancia, mucho mayor que tratándose de la manera de elevar a escritura pública el

testamento o codicilo hechos de palabra, de la apertura de las memorias testamentarias, por lo mismo que esa' nueva forma de testar, de peligrosa y delicada naturaleza, tiene su complemento más preciso y útil en la comprobación judicial?

"Tampoco olvidamos que el Juez, bajo su responsabilidad, puede dejar de cumplir lo que con esas *'observaciones oportunas'* se pretenda, del propio modo que cuando las mismas versen sobre la oposición a que se aprueben o no las diligencias practicadas; porque el Juzgado tiene, por el art. 693, en estos expedientes una misión exclusiva, aunque regulada por razones de prudencia y de amplio criterio, inspiradas en la consideración de hallarse o no suficientemente acreditada la autenticidad del escrito presentado. Pero nosotros establecemos el *possumus,* la facultad en los parientes y en el Ministerio fiscal de poder intervenir, por ejemplo, en la forma indicada, y la posibilidad legal de que el Juez tenga medios de admitir, sin infracción de precepto alguno sustantivo o adjetivo, tales extremos para lograr el fin que él también, con igual o mayor empeño, debe perseguir.

"Las repetidas *'observaciones. oportunas'* pueden, del propio modo, consistir en la aportación de documentos o justificaciones que se ofrecieren por dichos parientes o por el Ministerio fiscal. El art. 1813 de la ley procesal civil, comprensivo de una de las disposiciones generales sobre jurisdicción voluntaria, prevee el caso de que alguien que tenga interés legítimo en el expediente solicite que se le oiga en el mismo, en cuyo caso se le otorgará audiencia, poniéndosele aquél de manifiesto en la Escribanía por un breve término, que fijará el Juez según las circunstancias; pudiendo, a tenor del artículo siguiente, 1814, oírse también, cuando proceda, al que haya promovido el expediente. De suerte que no han de ser de peor condición los que intervengan en las diligencias para protocolizar el testamento ológrafo.''

El ilustre comentarista, en la página 394 del mismo tomo, y refiriéndose al último párrafo del artículo 693 del Código Civil español, equivalente también al párrafo último del artículo 643, de nuestro código, se expresa del siguiente modo:

"La manera como está concebida la redacción del último apartado de dicho precepto induce la conclusión de que siempre, o por lo menos en la mayor parte de los casos, el Juez debe acudir al criterio pericial para que le ilustre acerca de la autenticidad del testamento ológrafo, aunque ya estén insertas en los autos del expediente las declaraciones

testificales. La prudencia con que el Juez debe de proceder en resoluciones de trascendencia así lo exige, y la índole delicada y peligrosa del testamento ológrafo lo hace necesario para mayor garantía de todos los intereses comprometidos en aquél.

"En efecto, el cotejo pericial de letras puede ser una confirmación facultativa del dicho profano de los testigos y un modo de desvanecer las últimas dudas que pudieran ocurrir al juez acerca de la autenticidad que trata de averiguar y declarar. Para eso se ha escrito **la** frase del citado último apartado, *'siempre que el Juez lo estime conveniente'*, haya habido o no testigos y dudaran o no éstos respecto de los extremos por que son preguntados."

Vemos que Scaevola nos dice que el juez llamado a decretar la protocolización del testamento si estima justificada su identidad, no tendrá otro remedio que aquilatar dentro de los límites señalados a la tramitación general de expedientes **de** jurisdicción voluntaria, el valor de los elementos probatorios que se le propongan, o que él, de oficio, aporte a los autos. Este comentarista, yendo aún más lejos, opina que las observaciones oportunas pueden consistir en la aportación de documentos. No dice Scaevola, sin embargo, que el derecho a hacer observaciones imponga al juez el deber de autorizar un amplio interrogatorio sobre cuestiones que no se relacionen con la letra y firma del testador. ¿Cómo se comprueba la identidad del testamento? El código lo dice claramente: por medio de tres testigos que conozcan la firma y letra del testador y declaren que no abrigan duda racional de hallarse el testamento escrito y firmado de mano propia del mismo. El texto de la ley parece indicar que a los testigos se les llama para que declaren sobre la letra y la firma y no para otra cosa. Los interesados pueden hacer las observaciones que consideran pertinentes, pero en cuanto a los testigos, es evidente que no puede llevárseles, sin permiso de la corte, más allá de los límites que señala la misma ley. Si el juez tiene a bien permitir repreguntas no incurre en ningún error al resolver que el contrainterrogatorio debe girar y desenvolverse dentro de los límites trazados por el interrogatorio directo.

El Sr. Manresa, en sus comentarios sobre la Ley de Enjuiciamiento Civil española, se expresa así:

"Declaraciones de los testigos.—Deben ser tres, que conozcan la letra y firma del testador, como se ha dicho: serán examinados individualmente bajo juramento, en la forma ordinaria, poniéndoles de manifiesto el testamento para que puedan declarar, si así lo entienden, que no abrigan duda racional de hallarse escrito y firmado de mano propia del testador. Convendrá que expresen y se consignen también las razones o motivos que tengan para conocer la letra y firma de aquél. Podrán presenciar estas declaraciones los parientes citados que concurran, y hacer en el acto, de palabra, las observaciones oportunas sobre la autenticidad del testamento (art. 692 del Cód.), a cuyas observaciones habrán de contestar los testigos.

"Siempre que el juez lo estime conveniente, puede acordar el cotejo pericial de letras para asegurarse de la autenticidad del testamento, y debe acordarlo cuando los testigos examinados duden, o no los haya que conozcan la letra y firma del testador. Los peritos habrán de ser de exclusivo nombramiento del juez, el cual deberá también hacer por sí mismo el cotejo, como lo previene para caso análogo el art. 1963 de la ley, empleándose el procedimiento indicado en los formularios de los testamentos cerrados.

"Si el juez estima justificada la identidad o autenticidad del testamento, dictará auto mandando protocolizarlo con las diligencias practicadas, en los registros del notario de la cabeza del partido, o si hubiere más de uno, en el que corresponda por turno, por el cual se darán a los interesados las copias o testimonios que procedan como se ha dicho en los formularios de los testamentos cerrados. En otro caso, denegará la protocolización, según se ordena en el art. 693 del Código.

"Contra dicho auto, conceda o niegue la protocolización, no se da recurso alguno, y ha de llevarse a efecto, no obstante oposición, quedando a salvo el derecho de los interesados para ejercitarlo en el juicio declarativo que corresponda, como se ordena también en dicho artículo." 6 Manresa, Comentarios al Código de Enjuiciamiento Civil Español, p. 406, 407.

De las palabras de Manresa y Scaevola se deduce que la persona encargada de decretar o negar la protocolización del testamento es la llamada a resolver, dentro de una sana discreción y de acuerdo con las circunstancias del caso, el radio

de acción que debe abarcar el procedimiento para satisfacer su conciencia de juzgador. Convenimos en que aun cuando se trata de un expediente de jurisdicción voluntaria puede dársele a la práctica de las diligencias cierta latitud para que, sin desnaturalizar el procedimiento, todos los interesados aporten sus luces y la corte pueda recibir el beneficio de las mismas antes de llegar a una conclusión. Sin embargo, como hemos dicho, ésta es una función que debe ejercitar el juzgador en el uso de sus facultades discrecionales.

Esta corte, en el caso de *Vázquez* v. *Vázquez,* 34 D.P.R. 241, declara que la protocolización de un testamento ológrafo es más bien un acto de jurisdicción voluntaria. En *Collazo, Ex parte y Dávila, Opositora,* 45 D.P.R. 609, se declara que el auto dictado concediendo o negando la protocolización no autoriza un recurso de apelación y se dice:

"Es cierto que la medida tiene gran importancia. Ya hemos visto que por disposición expresa de la ley las copias constituirán título bastante para la inscripción total o parcial, en el registro de la propiedad, de los bienes inmuebles en que consista la herencia, pero está limitada también expresamente por la ley al reconocimiento de la autenticidad inmediato del documento, quedando a salvo los derechos de las personas a quienes pudiera perjudicar que deberán hacerlos valer en el juicio correspondiente."

De la opinión emitida en el caso citado transcribimos dos párrafos que allí se copian del comentarista Manresa:

"En cuanto a la citación que el art. 692 manda hacer a las personas expresadas en el mismo, nada tenemos que decir, pues no necesita comentario alguno esta garantía, toda vez que esas personas son por su orden los interesados, en primer término, en que se depure la identidad y legitimidad del testamento, por ser los llamados por la ley a la sucesión legítima en el caso de que la protocolización de dicho testamento fuere denegada. Es natural y lógico que en el caso de concurrir dichas personas a las diligencias de protocolización, puedan hacer en el acto, de palabra, las observaciones que estimen oportunas sobre la autenticidad del testamento, pues precisamente para ese efecto son llamadas, y así lo dispone dicho artículo."

"Pero téngase presente que si bien el juez habrá de tomar en

consideración dichas observaciones para formar su juicio sobre la identidad del testamento, aunque se hagan con el carácter de oposición, y aunque se formule ésta por escrito, tal oposición no puede producir en ningún caso el efecto de hacer contencioso el expediente de jurisdicción voluntaria, ni el de impedir que el juez dicte la resolución que estime procedente otorgando o negando la protocolización del testamento cerrado. Cualquiera que sea esta resolución, ha de llevarse a efecto, no obstante la oposición, quedando a salvo el derecho de los interesados para ejercitarlo en el juicio que corresponda, como se ordena en el párrafo 2º. del art. 693. Dicho juicio, para impugnar o sostener la identidad y validez del testamento, habrá de ser, por regla general, el ordinario de mayor cuantía.'' 5 Manresa, Comentarios al Código Civil, 511, 519.

Del tomo 29, página 767, de la Enciclopedia Jurídica Española, tomamos el siguiente párrafo:

''Creemos conveniente advertir: 1, que cualquiera que sea la resolución del juez se llevará a efecto, no obstante oposición, quedando a salvo el derecho de los interesados para ejercitarlo en el juicio que corresponda (art. 693) ; 2, que por eso mismo y puesto que se trata de un acto de jurisdicción voluntaria, en materia que puede ser de nuevo ventilada en juicio, contra la resolución de la Audiencia, si a ella hubiere ido el asunto en apelación de la sentencia del juez, no se da recurso de casación; 3, aunque el testamento no haya sido protocolado, no por eso quienes se crean perjudicados por sus disposiciones están impedidos de defender su validez o impugnarlo judicialmente como nulo.''

Sánchez Román, discutiendo las reglas procesales que han de regular el procedimiento de protocolización de testamento ológrafo dice así:

''Cierto es que el art. 691 se refiere al supuesto de la presentación del testamento ológrafo, y parece contiene en el texto las reglas de trámite que han de observarse en dicha presentación, completadas con la citación de ciertas personas a que se refiere el artículo siguiente; es decir, que todo el procedimiento señalado por el Código está en realidad contenido en dicho art. 691, con esa adición del 692, hasta el momento de la resolución judicial y sus efectos, a que se contrae el 693. Aquellas reglas procesales del 691 se limitan a lo siguiente:

''1. Presentación del testamento ológrafo.

''2. Justificación del fallecimiento del testador.

"3. Apertura por el juez del testamento, si estuviera comprendido en pliego cerrado.

"4. Rúbrica del juez con el actuario en todas las hojas en que esté contenido el testamento.

"5. Comprobación de su identidad por medio de tres testigos que conozcan la letra y firma del testador, los cuales declararán que no abrigan duda racional de hallarse el testamento escrito y firmado de mano propia' del mismo.

"6. En defecto de testigos idóneos o si dudan los examinados y siempre que el juez lo estime conveniente, podrá emplearse con dicho .objeto el cotejo pericial de letras.

"7. Y a lo anterior puede agregarse, según el 692, la citación para la práctica de las diligencias antes expresadas, y con la' brevedad posible, 'al cónyuge sobreviviente, si lo hubiere, a los descendientes y ascendientes legítimos del testador, y en defecto de unos y otros, a los hermanos o al Ministerio fiscal, cuando las personas antes indicadas no residieran dentro del partido, si se ignorara su existencia o fueran menores o incapacitadas sin representación legítima, pudiendo todos los citados presenciar la práctica de dichas diligencias y hacer en el acto de palabra las observaciones oportunas sobre la autenticidad del testamento." Sánchez Román, Derecho Civil, tomo 6, pág. 376 y 377.

En las páginas 380 y 381 de la referida obra dice el mismo autor:

"Son únicamente dos los derechos, según se ha dicho, que expresamente reconoce el art. 692 a las personas citadas, por consecuencia de la citación: el de *poder presenciar* la práctica de las diligencias de protocolización, lo cual significa que su asistencia a ellas no es indispensable ni obligatoria, sino potestativa, no produciendo su falta, una vez citados, nulidad de las mismas; y el de su intervención en ellas mediante tan solo el de *hacer en el acto, de palabra, las observaciones oportunas sobre la autenticidad del testamento,* lo cual no significa cosa semejante a especie de contención alguna, ni menos que estas observaciones puedan traspasar los límites y finalidad concreta y exclusiva, que es la de hallar elementos de información sobre dicha autenticidad, cualquiera que sea el derecho de impugnación de la resolución que el juez dicte otorgando o denegando la identidad y protocolización del testamento, cuya resolución causará estado y se llevará 'a efecto aunque hubiere interesados que la contradigan o a ella se opongan, los cuales no podrán formalizar su oposición y ejercitar su derecho sino *fuera* y *después* del expediente de protocolización,

y en el *juicio correspondiente,* según declara el artículo 693. Quiere esto decir, en suma que dicho expediente o diligencias de protocolización, de evidente *jurisdicción voluntaria,* jamás se convertirán en *contenciosas,* y que toda oposición habrá de tramitarse promoviendo aparte el juicio correspondiente.''

Y últimamente el Tribunal Supremo de España, en sentencia de 28 de enero de 1914, dice que ''siendo el objeto de la protocolización el comprobar tan sólo un requisito de forma, cual es la identidad de la letra y firma del testador, es evidente que si en el documento que por su redacción tiene los caracteres de un testamento ológrafo, . . . . se aprecian desde luego ordenaciones que afectan a su validez o que implican su nulidad, tanto respecto a las formalidades exigidas por el artículo 688 del citado Código, cuanto por causas que se refieran al fondo o contenido de sus cláusulas o disposiciones, puedan alegarse ejerciendo la acción oportuna por aquéllos a quienes perjudiquen, para conseguir esa declaración de nulidad, pues ninguna eficacia en contrario puede tener la protocolización pretendida, como expresamente se reconoce en el artículo 693, toda vez que, se acceda o no a aquélla, siempre queda a salvo el derecho de los interesados para ejercitarlo en el juicio que corresponda, siendo base de este precepto el principio de derecho de que lo que es nulo en su origen, por ser contrario a la ley, no puede convalidarse por una mera ritualidad de procedimiento.''

En el presente caso la corte permitió a las peticionarias examinar con sus peritos el alegado testamento. Las observaciones hechas por sus abogados demuestran un estudio detenido del referido documento. Las peticionarias se querellan de que no se les permitió repreguntar a los testigos al iniciarse la práctica de las diligencias y de que tampoco pudieron hacer uso de este derecho con la amplitud debida durante la continuación de la vista. Los autos demuestran que se autorizó a los interesados para interrogar a los testigos sobre la letra y firma del alegado testador. Opinamos que la corte inferior tiene discreción para regular la práctica de

las diligencias y que en el ejercicio de la misma puede permitir a los interesados toda aquella intervención que sea compatible con la naturaleza del procedimiento; pero si la discreción judicial se ha basado en la interpretación que le ha merecido la ley y no tenemos base para decir que esa ley ha sido erróneamente interpretada, es claro que este tribunal no debe intervenir para invadir funciones reservadas a la corte inferior en el uso de sus facultades discrecionales. En nuestro sentir el juzgador puede actuar con liberalidad, abriendo su conciencia a la luz, hasta donde lo permita la naturaleza del procedimiento, que no debe perder su carácter de jurisdicción voluntaria para adquirir la plenitud del juicio declarativo a que según el código tienen derecho los interesados, cualquiera que sea la resolución que se dicte.

Los interesados en este caso no pueden decir que se les ha privado fundamentalmente de ningún derecho. En el juicio declarativo pueden discutirse ampliamente aquellas cuestiones relacionadas con la validez o nulidad del alegado testamento. La protocolización no prejuzga cuestión alguna. Los interesados quedan en libertad de ejercitar sus derechos, sin trabas ni obstáculos, en un juicio plenario, hasta que recaiga una decisión judicial definitiva. Para proteger los derechos que puedan asistir a todas las partes interesadas nuestras leyes sustantivas y adjetivas establecen amplias garantías que no se escapan a la agudeza y penetración de los distinguidos abogados de las peticionarias.

*Debe anularse el auto expedido y declararse sin lugar la solicitud.*

El Juez Asociado Señor Hutchison está conforme con el resultado y con la mayor parte de la opinión, creyendo que el procedimiento pudo haber sido un poco más liberal en ciertos extremos.

### OPINIÓN CONCURRENTE DEL JUEZ ASOCIADO SEÑOR WOLF

Dudo que los hechos discutidos durante la vista se hallaran debidamente ante este tribunal. En otras palabras, si

la prueba tomada ante la corte inferior formaba parte del récord en tal forma que fuera revisable por *certiorari*. El juez debe intervenir antes que los hechos puedan ser considerados como identificados y ciertos. El juez en el presente caso tal vez pudo haber hecho algunas correcciones a la transcripción taquigráfica, aun al extremo de demostrar la intervención concedida por él a las peticionarias. Como en este caso específico la orden fué librada para que se elevara la transcripción taquigráfica, podría asumirse hasta cierto punto el consentimiento del juez respecto a lo correcto de la transcripción. Aún sostengo que cuando es necesario agregar hechos, *ore tenus,* a un récord, el recurso de *certiorari* muy corrientemente no es el remedio adecuado.

Aunque la opinión de esta corte analiza la prueba, basa su razonamiento en el hecho de que el verdadero remedio de las partes es acudir a un pleito ordinario. Esta es la opinión de los comentaristas, y a mi juicio, la letra de la ley.

El móvil principal de esta opinión concurrente es indicar mi teoría respecto a que una vez que la corte dió a las partes la oportunidad de hacer observaciones, la ley quedó cumplida. Entonces, cualquier error de apreciación de. parte del juez sólo podía ser atacado mediante un juicio plenario.

Ideas similares a las presentes fueron expresadas en mi opinión disidente en el caso de *Asociación de Padres Capuchinos de Pennsylvania en Puerto Rico* v. *Corte de Distrito,* 44 D.P.R. 973. Fué en esta forma que pensé complementar mi concurrencia con la opinión de este tribunal.