AB INTESTATO ALFONSO LUGO RODRÍGUEZ, *Ex parte*; LIONEL LUGO RODRÍGUEZ, peticionario y recurrente; CARMEN HERMINIA LUGO RODRÍGUEZ, interventora y recurrida.

*Número:* CC-1998-917          *Resuelto:* 28 de junio de 2000

*José Luis Novas Dueño*, abogado de la parte peticionaria; *Harry N. Padilla Martínez*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

Alfonso M. Lugo Rodríguez falleció el 12 de diciembre de 1996, en cuyo momento le sobrevivieron sus hijos Carmen H. Lugo y Lionel Lugo.

El 7 de enero de 1997, Lionel presentó ante el Tribunal de Primera Instancia, Sala Superior de Mayagüez (Civil

Núm. IJV97-0001), un asunto sobre cartas testamentarias. Solicitó que se ratificara el deseo de su padre y se le nombrara albacea del caudal relicto. Basó su pedido en un testamento abierto otorgado el 29 de abril de 1993 en Ponce, mediante la Escritura Núm. 49, ante el notario público Raúl Ramos Torres.

Días después, el 24 de enero, Carmen solicitó la protocolización de un testamento ológrafo en el Tribunal de Primera Instancia, Subsección de Distrito, Sala de San Germán (Civil Núm. CD97-51). En dicho testamento se revocaba el abierto de 1993, y se designaban a los dos (2) hermanos herederos en partes iguales.

El 25 de marzo, Lionel solicitó al Tribunal de Primera Instancia, Sala Superior de San Germán, la protocolización de dos (2) testamentos ológrafos que alegadamente había dejado su padre. Los testamentos disponían:

> *Marzo 24, 1994. Es mi deseo cuando muera que el testamento de abril de 1993 sea válido.*— (Firmado) *Alfonso Lugo.*
> *Abril 24, 1994. Es mi deseo al morir que el testamento de abril de 1993 sea válido revocando al anterior. Alfonso Lugo.*
> Anejo II, pág. 20.

En la vista para la adveración de estos testamentos ológrafos, se presentaron tres (3) testigos. Lionel fue el primero. Señaló que los documentos presentados eran escritos de puño y letra de su padre y no albergaba dudas de su letra y firma. El segundo testigo, Cruz Colón Lugo, agrónomo de profesión y agricultor, testificó que conoció al causante a través de su trabajo. Además, fue uno de los testigos del testamento abierto otorgado en Ponce en 1993. Al mostrarle los documentos dijo que la firma era igual a la que vio en Ponce en 1993. Sobre la letra, admitió que durante el contrainterrogatorio había visto al causante tomar notas, a unos tres (3) pies de distancia, cuando él lo orientaba sobre préstamos. Eso fue lo más cerca que estuvo de sus escritos; no obtuvo copia de las notas, tampoco las leyó, cotejó o corrigió. Simplemente lo veía escribir a una distan-

cia de unos tres (3) pies. Admitió que nunca había visto escribir al causante un texto tan "extenso" como los testamentos que se le presentaron, sino tan sólo una fecha escrita. El último testigo presentado fue Amilcar Gutiérrez Acosta. Declaró que fue empleado del causante desde julio de 1994. Conocía su firma a través de los cheques que le expedía por concepto de su salario. Sobre la letra, indicó que durante la vigencia de su empleo el causante alegadamente le dio unas cinco (5) o seis (6) notas para hacer recados. De éstas, recordó sólo una cuyo contenido fue el siguiente: manga, raíz, martillo y llave.[1]

Concluido el testimonio de los tres (3) testigos, Lionel solicitó al tribunal que le permitiese presentar el *testimonio* de un perito dado que el testigo Cruz Colón "tuvo duda sobre el texto de los documentos ...". El tribunal se negó, ya que entendió que se había desfilado ante sí prueba suficiente para resolver.

El 3 de abril de 1998 el tribunal de instancia decretó que "no abriga[ba] duda racional alguna de que [los] documentos [presentados por Lionel] constitu[ían] disposiciones de última voluntad, escritos y firmados por la mano de don Alfonso Modesto Lugo Rodríguez ...". Anejo II, pág. 22. Por tal razón ordenó su protocolización.

Inconforme, Carmen presentó *certiorari* ante el Tribunal de Circuito de Apelaciones (Tribunal de Circuito). Adujo que instancia erró al ordenar la protocolización de los documentos, toda vez que no todos los testigos presentados para identificarlos eran aptos o idóneos. En oposición, Lionel solicitó la desestimación del recurso amparado en la Regla 67 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A. Además, planteó que el

---

[1] La susodicha nota supuestamente se originó en una encomienda de Lugo Rodríguez al testigo. Durante el contrainterrogatorio, se cuestionó la necesidad o existencia del escrito, dado que el propio Lugo Rodríguez acompañó al testigo a la ferretería. Se invocó esto, aparentemente, con el fin de establecer la inexistencia de la nota y la subsiguiente inferencia la falta de conocimiento de los rasgos caligráficos del testador. Además, surge la interrogante ¿venden maíz en las ferreterías?

recurso, en vista de que no se habían protocolizado los testamentos, era académico.

El Tribunal de Circuito oportunamente rechazó los argumentos de Lionel. Dictaminó que el asunto era revisable vía *certiorari* en virtud del Art. 4.002(e) del Plan de Reorganización Núm. 1[a] de la Rama Judicial de 28 de julio de 1994, según enmendado, conocido como "Ley de la Judicatura de Puerto Rico de 1994" (en adelante Ley de la Judicatura de 1994), 4 L.P.R.A. sec. 22k(e).([2]) Asimismo, ordenó a Lionel mostrar causa por la cual no debía expedirse el auto. Lionel compareció.

Previa comparecencia de Lionel, el Tribunal de Circuito (Hons. Rossy García, Martínez Torres y Rodríguez García) dictó sentencia mediante la cual expidió el auto y ordenó la celebración de una vista de adveración a la que deben comparecer tres (3) testigos que conozcan tanto la letra como la firma del testador y se observen las demás exigencias del Código Civil. Asimismo, ordenó la anulación de las inscripciones en el Protocolo del notario y en el Registro de Testamentos e instruyó al Tribunal de Primera Instancia —una vez señalada la nueva vista de adveración— que mande a remover los testamentos del protocolo notarial y trasladarlos a la vista. El notario prepararía entonces la correspondiente acta aclaratoria. El foro intermedio basó su decisión, primero, al reiterar que tenía jurisdicción bajo la Ley de la Judicatura de 1994 y en el hecho de que el Art. 643 del Código Civil, 31 L.P.R.A. sec. 2167 —que provee la acción ordinaria de impugnación— no deroga la evidente

---

([2]) El Art. 4.002(e) de la Ley de la Judicatura de 1994 dispone:

"El Tribunal de Circuito de Apelaciones conocerá en los siguientes asuntos:

"(e) Mediante auto de *certiorari* expedido a su discreción, *revisará las resoluciones finales en procedimiento de jurisdicción voluntaria,* dictadas por el Tribunal de Primera Instancia, incluyendo el Tribunal de Distrito durante el proceso de su abolición. En estos casos, el recurso de *certiorari* se formalizará presentando una solicitud a tales efectos dentro de los treinta (30) días siguientes al archivo en autos de copia de la notificación de la resolución. Este término es jurisdiccional." (Énfasis en el original.) 4 L.P.R.A. sec. 22k(e).

intención legislativa de reconocer otro mecanismo procesal alterno. Añadió el tribunal que el testigo Cruz Colón estaba imposibilitado de adverar el texto del documento presentado, ya que admitió que sólo le era familiar la firma del testador y que no había visto escrito alguno de éste, por lo que no cumplía con los requisitos legales para ser considerado como un testigo capacitado e idóneo para reconocer los rasgos caligráficos del testador. Por último, dictaminó su facultad para ordenar la anulación del otorgamiento.

Inconforme, Lionel acudió ante nos.[3] Revisamos.

## II

■ La Ley de la Judicatura de 1994, mediante su citado Art. 4.002(e), transformó radicalmente el ordenamiento procesal hasta entonces vigente al autorizar varios *certiorari* para la revisión de resoluciones dictadas en procedimientos de jurisdicción voluntaria.

■ El caso ante nos cae en esa categoría. El testamento es un acto formal o solemne (*ad solemnitates*). La última voluntad expresada de otra manera no tiene valor ante la ley, ya que por mandato del legislador *la forma es esencial al acto jurídico. Rodríguez Sardenga v. Soto Rivera*, 108 D.P.R. 733, 734–735 (1979). Respecto al testamento ológrafo, su validez queda estrictamente atada a las *formalidades* siguientes: todo escrito y firmado por el testador, con expresión del año, mes y día en que se otorgue y

---

[3] Discute los señalamientos de error siguientes en su Alegato del peticionario, pág. 1:

"1. Erró el Honorable Tribunal de Circuito de Apelaciones al determinar que la Ley de la Judicatura de 1994 según enmendada le concede competencia para revisar por vía de certiorari una resolución final del Tribunal de Primera Instancia acordando la protocolización de un testamento ológrafo.

"2. Erró el Honorable Tribunal de Circuito de Apelaciones al descartar las determinaciones de hecho del Tribunal de Primera Instancia y considerar que no se había autenticado debidamente por los testimonios presentados los testamentos ológrafos cuya protocolización se interesaba.

"3. Erró el Honorable Tribunal de Circuito de Apelaciones al considerar un recurso sobre un asunto académico."

si tuviera palabras tachadas, enmendadas o entre renglones, salvadas por el testador bajo su firma. Art. 637 del Código Civil, 31 L.P.R.A. sec. 2161. La "[f]ormalidad es cada requisito particular ... sin los cuales [el testamento no nace] a la vida jurídica". E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. II, pág. 105. Véase, además, *Paz v. Fernández*, 76 D.P.R. 742 (1954).

■ En lo pertinente a la formalidad de autografía (escrito todo de mano propia) y a la firma, la comprobación de la identidad del testador se verificará mediante el procedimiento de adveración. El testamento ológrafo, como documento privado, carece de eficacia jurídica mortis causa hasta tanto no culmine el procedimiento *ex parte* de adveración y protocolización. González Tejera, *op. cit.*, pág. 129. Sin embargo, este procedimiento tiene un doble carácter, a saber, verificar la autografía y firma, y segundo, autorizar su protocolización. El Art. 654 del Código Civil, 31 L.P.R.A. sec. 2191, dispone que "[l]os testamentos otorgados sin la autorización del notario serán ineficaces si no se elevan a escritura pública y se protocolizan ...". *En vista de este precepto, no podemos caracterizar como meramente procesal la protocolización; en su fondo goza de esencialidad formal.*

El trámite implica —luego de la presentación del documento y la acreditación del fallecimiento de su autor— que el Tribunal de Primera Instancia cite al cónyuge supérstite, de haberlo, a los descendientes y ascendientes y, en su defecto, a los hermanos.(⁴) *Es necesaria la comparecencia de tres (3) testigos que conozcan la letra y firma del causante para dar comienzo a la lectura del testamento.*(⁵)

■ Presentado el testamento y acreditado el deceso, el juez rubricará, conjuntamente con el notario, todos sus folios y, de quedar convencido que la letra y firma perte-

(⁴) Art. 642 del Código Civil, 31 L.P.R.A. sec. 2166.
(⁵) Art. 641 del Código Civil, 31 L.P.R.A. sec. 2165.

nece a quien se le atribuye, ordenará su protocolización. El convencimiento de la autografía del testamento lo obtendrá a base de los testimonios vertidos por los testigos. *No obstante, el juez puede ordenar el cotejo pericial de las letras, de creerlo necesario, así como exigir prueba de peritos calígrafos.*(⁶) Además, los interesados pueden hacer observaciones oportunas relacionadas con la letra y firma del testador; sin embargo, ello no impone al juzgador el deber de autorizar un interrogatorio ni abrir las puertas para dilucidar asuntos distintos a la autografía. *Cabassa Vda. de Fajardo v. Corte*, 47 D.P.R. 372, 384 (1934).

## III

■ Antes de la aprobación del citado Art. 4.002(e) de la Ley de la Judicatura de 1994, los interesados en cuestionar el testamento —ya por autenticidad como contenido— podían promover juicio. La disponibilidad de esta acción civil ordinaria significaba que la validez del testamento, así como el procedimiento de adveración y protocolización, no se transformaba en contencioso. *Cabassa Vda. de Fajardo v. Corte*, supra.

■ Inicialmente, nuestra jurisprudencia pasada admitió apelaciones contra la negativa de una solicitud de protocolización sin problematizarse siquiera su revisión. *Ex parte Planis v. Pueblo*, 42 D.P.R. 689 (1931); *Vázquez v. Vázquez*, 34 D.P.R. 241 (1925). Sin embargo, en *Collazo, Ex Parte, y Dávila, Opositora*, 45 D.P.R. 609 (1933), confrontamos la interrogante sobre la viabilidad de esa "revisión" y resolvimos que una resolución que autorizara o no la protocolización era inapelable.

Las mismas razones que entonces pesaron para esa solución, nos mueven hoy a apartarnos y revocar dicha norma: *primero*, la resolución no constituye *sentencia* defi-

---

(⁶) Art. 641 del Código Civil, *supra.*

nitiva, y *segundo*, la autorización de la Asamblea Legislativa.

■ En su versión original, inalterada hasta el presente, el Art. 643 del Código Civil, *supra*, no concedía (ni concede) recurso alguno contra la autorización o denegación de protocolización. La única vía en que quedaban a salvo los derechos de los afectados, bajo el ordenamiento vigente hasta 1994, era mediante juicio declarativo, no porque fuera la única forma concebible, sino porque era la exclusivamente autorizada por el legislador.

Sin embargo, hemos visto que la Ley de la Judicatura de 1994 proveyó un *certiorari* para que los interesados revisaran los procedimientos de jurisdicción voluntaria, como lo es la autorización o denegación de protocolización del testamento ológrafo.

■ Este vehículo procesal, a diferencia de una apelación en juicio ordinario, puede de forma expedita revisar la corrección de una determinación sobre la autografía o el procedimiento mismo de adveración. Sabido es que el *certiorari* es un recurso discrecional que hace viable la justa y pronta adjudicación. Por un lado, está disponible el mecanismo de orden para mostrar causa, de comparada utilidad y eficacia; por otro, si careciera de méritos, puede ser resuelto mediante una breve resolución explicativa.

Cuando confrontamos el recurso de *certiorari* con el juicio declarativo ordinario y una eventual apelación —en que se puede cuestionar la autenticidad del testamento respecto a la firma del causante, *pero además*, la validez de su contenido, capacidad del testador, observancia de requisitos formales, veracidad de la fecha, etc. (distribución, mandas, legados, etc.)— es evidente que se demorará inevitablemente la determinación final.

■ La comprobación de la identidad de la firma del testador, en unión a la autorización de protocolización, genera ciertos derechos inmediatos que, de cerrarse inmedia-

tamente las puertas apelativas, quedarían afectados.[7] No podemos suscribir ese curso decisorio que, para todos efectos, en este extremo, anula el *certiorari* establecido por la Ley de la Judicatura de 1994.[8]

Concluimos que el Tribunal de Circuito tenía jurisdicción para discrecionalmente, vía *certiorari*, ejercer su facultad revisora.

Los restantes dos (2) señalamientos de error no ameritan discusión. Es obvio que el testigo Cruz Colón no satisfizo el criterio de idoneidad en el extremo de certificar la escritura del testador. Y, ciertamente, el recurso no era académico por haberse realizado la protocolización. Ese trámite erróneo no es irrevocable y fue atendido satisfactoriamente en el mandato del Tribunal de Circuito.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Fuster Berlingeri concurrió con en el resultado sin opinión escrita. El Juez Asociado Señor Corrada Del Río emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Hernández Denton.

---

[7] Por ejemplo: los herederos instituidos en el testamento se reputan frente a todo el mundo como tales y los derechos sucesorios de los herederos testamentarios sobre bienes inmuebles del causante pueden ser anotados en el Registro de la Propiedad.

[8] Bajo la tesis tradicional, el Poder Judicial sólo puede adjudicar "controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio ...". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958). Es respetable, pues, la perspectiva de algunos juristas y abogados que sostienen que el *certiorari* que nos ocupa es innecesario y carece de lógica.

Frente a esa postura, otros aducen que la visión original ha quedado un tanto rezagada con el advenimiento en las últimas décadas de todo un esquema legislativo y jurídico apuntalado en el derecho administrativo. Por vía de ejemplo, por medio de los Arts. 2 y 3 la Ley de Asuntos No Contenciosos Ante Notario, Ley Núm. 282 de 21 de agosto de 1999 (4 L.P.R.A. secs. 2155–2156), asigna a los notarios competencia concurrente con los tribunales para atender algunos procedimientos de jurisdicción voluntaria.

El planteamiento en su fondo, no planteado directamente en este recurso, conllevaría examinar la validez constitucional del citado Art. 4.002(e) de la Ley de la Judicatura de 1994. Basado en la doctrina de los límites de la revisión judicial, en la cual se establece que los tribunales no debemos enjuiciar la constitucionalidad de un estatuto a menos que sea estrictamente necesario, nos abstenemos de explorar esa ruta decisoria.

— O —

Opinión disidente emitida por el Juez Asociado Señor Corrada Del Río, a cual se une el Juez Asociado Señor Hernández Denton.

La opinión mayoritaria de este Tribunal resuelve que el Art. 4.002(e) de la Ley de la Judicatura de Puerto Rico de 1994 (4 L.P.R.A. sec. 22k(e) (Supl. 1998)), le da facultad al foro apelativo intermedio para revisar, mediante *certiorari*, una resolución final del Tribunal de Primera Instancia que autoriza o deniega la adveración y protocolización de un testamento ológrafo. La mayoría concluye que la intención legislativa al aprobar el referido artículo fue dejar sin efecto a *Collazo, Ex Parte, y Dávila, Opositora*, 45 D.P.R. 609 (1933), donde resolvimos que una resolución a esos efectos es inapelable.

La mayoría también entiende que la aprobación del Art. 4.002(e) de la Ley de la Judicatura de Puerto Rico de 1994, *supra*, constituyó un mecanismo procesal alterno a la acción ordinaria de impugnación para aquella parte que pueda verse afectada por dicha resolución. Por último, sostiene que la protocolización de un testamento ológrafo no es meramente un trámite procesal sino que, en su fondo, goza de esencialidad formal.

Disentimos de la opinión mayoritaria por entender que la resolución en la cual se acuerda o deniega la adveración y la protocolización de un testamento ológrafo no es revisable. Disentimos, además, porque entendemos que la aprobación de la Ley de la Judicatura de Puerto Rico de 1994 no tuvo el propósito de revocar a *Collazo, Ex Parte y Dávila, Opositora*, supra, ni de crear otro remedio en ley, adicional a la acción ordinaria de impugnación de un testamento.

# I

A través del recurso instado en el caso de epígrafe se solicita la revocación del dictamen del Tribunal de Circuito de Apelaciones mediante el cual dicho foro resolvió que es revisable mediante *certiorari* una resolución del tribunal de instancia que ordena la adveración y protocolización de un testamento ológrafo, en virtud del Art. 4.002(e) de la Ley de la Judicatura de Puerto Rico de 1994, *supra.* Al así dictaminar, el tribunal apelativo dejó sin efecto la adveración y orden de protocolización autorizada por el tribunal de instancia y ordenó la celebración de una nueva vista de adveración a la que debían comparecer tres (tres) testigos que conozcan la letra y firma del testador.

No conforme, el peticionario acude ante nos mediante petición de *certiorari.* Señala que el foro apelativo cometió los errores siguientes:

> Erró el Honorable Tribunal de Circuito de Apelaciones al determinar que la Ley de la Judicatura de 1994 según enmendada le concede competencia para revisar por vía de certiorari una resolución final del Tribunal de Primera Instancia acordando la protocolización de un testamento ológrafo.
> Erró el Honorable Tribunal de Circuito de Apelaciones al descartar las determinaciones de hecho del Tribunal de Instancia y considerar que no se había autenticado debidamente por los testimonios presentados los testamentos ológrafos cuya protocolización se interesaba.
> Erró el Honorable Tribunal de Circuito de Apelaciones al considerar un recurso sobre un asunto académico. Alegato del peticionario, pág. 1.

# II

El Art. 616 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2121, define *testamento* como

> [e]l acto por el cual una persona dispone para después de su muerte de todos sus bienes, o de parte de ellos ....

En cuanto al testamento ológrafo, el Art. 627 de nuestro Código Civil, 31 L.P.R.A. sec. 2143, establece que

[s]e llama ológrafo el testamento cuando el testador lo escribe por sí mismo en la forma y con los requisitos que se determinan en la sec. 2161 de este título.[1]

Con respecto a la presentación del testamento, el Art. 640 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2164, establece que

[l]a persona en cuyo poder se halle depositado dicho testamento deberá presentarlo al Tribunal Superior luego que tenga noticia de la muerte del testador; y no verificándolo dentro de los diez días siguientes, será responsable de los daños y perjuicios que se ocasionen por la dilación.

También podrá presentarlo cualquiera que tenga interés en el testamento como heredero, legatario, albacea o en cualquier otro concepto.

Tras la presentación y prueba del fallecimiento del otorgante, se llevarán a cabo las diligencias relativas a la adveración del testamento ológrafo. Sobre dicho asunto, el Art. 641 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2165, dispone que

[p]resentado el testamento ológrafo, y acreditado el fallecimiento del testador, el Tribunal Superior procederá a su lectura en audiencia pública y en día y hora señalados al efecto, dentro del segundo día a más tardar, abriéndolo si estuviere en pliego cerrado, rubricándolo los jueces con el notario en todas las hojas, y comprobando acto continuo su identidad por medio de tres testigos que conozcan la letra y firma del testador, y declaren que no abrigan duda racional de hallarse el testamento escrito y firmado de mano propia del mismo.

---

[1] La citada sec. 2161 corresponde al Art. 637 de nuestro Código Civil, y dispone quiénes pueden otorgar un testamento ológrafo. "El testamento ológrafo sólo podrá otorgarse por personas mayores de edad.

"Para que sea válido este testamento, deberá estar escrito todo y firmado por el testador, con expresión del año, mes y día en que se otorgue.

"Si contuviere palabras tachadas, enmendadas o entre renglones, las salvará el testador bajo su firma." 31 L.P.R.A. sec. 2161.

A falta de testigos idóneos, o si dudan los examinados, y siempre que el Tribunal Superior lo estime conveniente, podrá emplearse con dicho objeto el cotejo pericial de letras.

Justificada la identidad del testamento, el procedimiento subsiguiente se rige por el Art. 643 del Código Civil, 31 L.P.R.A. sec. 2167, que en lo pertinente establece que

[s]i el Tribunal Superior estima justificada la identidad del testamento, acordará que se protocolice, con copia certificada de las diligencias practicadas en los registros del notario que los interesados designen, por el cual se librarán las copias o testimonios que procedan, que constituirán título bastante para la inscripción, total o parcial, en el registro de la propiedad, de los bienes inmuebles en que consista la herencia. Si no hubiese conformidad entre los interesados, o si el notario designado por éstos estuviere incapacitado por alguna de las causas que señala la Ley Notarial, entonces la corte designará libremente un notario que tenga oficina abierta en su distrito.

*Cualquiera que sea la resolución del Tribunal Superior, se llevará a efecto, no obstante oposición, quedando a salvo los derechos de los interesados para ejercitarlos en el juicio que corresponda.* (Énfasis suplido.)

En torno a la protocolización de un testamento ológrafo, el Art. 639 de nuestro Código Civil, 31 L.P.R.A. sec. 2163, añade que

[e]l testamento ológrafo deberá protocolizarse, presentándolo con este objeto a la sala del Tribunal Superior del último domicilio del testador, o a la del lugar en que éste hubiese fallecido, si el fallecimiento hubiere tenido lugar en Puerto Rico, dentro de cinco años contados desde el día del fallecimiento. Sin este requisito, no será válido.

Sobre el particular, Manresa nos comenta que, mediante la protocolización, el testamento adquiere la cualidad de instrumento público y, por ende, será considerado como la verdadera y legítima disposición testamentaria del

otorgante, hasta tanto no sea declarada nula o ineficaz, parcial o totalmente.(²)

Así mismo añade que:

> Pero téngase presente que si bien el Juez habrá de tomar en consideración dichas observaciones para formar su juicio sobre la identidad del testamento, aunque se hagan con el carácter de oposición, y aunque se formule ésta por escrito, *tal oposición no puede producir en ningún caso el efecto de hacer contencioso el expediente de jurisdicción voluntaria*, ni el de impedir que el Juez dicte la resolución que estime procedente otorgando o negando la protocolización del testamento cerrado. Cualquiera que sea esta resolución, ha de llevarse a efecto, no obstante la oposición, *quedando a salvo el derecho de los interesados para ejercitarlo en el juicio que corresponda*, como se ordena en el párrafo segundo del artículo 693. Dicho juicio, para impugnar o sostener la identidad y validez del testamento, habrá de ser, por regla general, el ordinario de mayor cuantía.(³) (Énfasis suplido.)

Por su parte, el profesor Vélez Torres manifiesta que:

> El procedimiento de adveración y protocolización es uno que no impide que cualquier persona interesada en promover la nulidad o inefectividad del testamento, o de alguna de sus cláusulas, lo haga en el correspondiente juicio plenario.
>
> . . . . . . . .
>
> En otras palabras, el hecho de que un tribunal ordene protocolizar un documento como testamento ológrafo conforme dispone el Código no tiene el efecto de afectar posibles derechos de terceros. Estos, si así lo consideran conveniente a sus derechos, pueden reclamar lo que corresponda. Pero tal reclamación no procede en el procedimiento de jurisdicción voluntaria que autoriza el Código con el fin de convertir en público un documento privado que contiene el testamento ológrafo. El procedimiento de jurisdicción voluntaria no es, pues, apelable; no constituye cosa juzgada; no quita ni da derechos, etc. Si alguien no está conforme con lo que, supuestamente, el testador ordena, tiene un recurso: reclamar judicialmente por la vía ordinaria, en jui-

---

(²) J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 7ma ed., Madrid, Ed. Reus, 1972, T. V, pág. 694.

(³) Íd., págs. 701–702.

cio adversativo, conforme al procedimiento que autorizan las vigentes reglas de enjuiciamiento civil.(⁴)

Así también, el tratadista español Manuel Albaladejo sostiene que

> [c]omo se ve, de lo expuesto se deduce que el principal fin perseguido por los anteriores trámites, es el de *adverar* el testamento, es decir, certificar o dar por cierto que *realmente procede* DE QUIEN *aparentemente lo otorgó* (lo que se llama también comprobar su *autenticidad* o *identidad*). Y si se estima testamento verdaderamente procedente de dicha persona, entonces se ordena que se incorpore a un protocolo notarial (que se *protocolice*).
>
> Ahora bien, aunque, en rigor la *adveración* sea sólo la comprobación de que el escrito es de quien se reputa que lo otorgó, y aunque la ley haya contemplado únicamente la constatación de esa procedencia, parece razonable que (por contradictorio que parezca *literalmente*) sea facultad del juez desestimar la *adveración* y no ordenar, consiguientemente, la *protocolización*, si (aunque quede probado que procede de quien se supone lo otorgó) el documento es *evidentemente inválido* como testamento (por ejemplo carece de fecha).(⁵) (Énfasis en el original.)

Posteriormente, aclara Albaladejo que aquellos interesados que se opongan al auto al afirmar o denegar la protocolización tienen derecho a promover el juicio correspondiente. Sin embargo, excluye la posibilidad de que éstos puedan recurrir en apelación de dicho dictamen, cuando su argumento esté basado en un aspecto sustantivo, como lo sería la impugnación por nulidad de testamento. Distinto sería si se tratase de un planteamiento puramente procesal(⁶) —como por ejemplo, la omisión de citar a cualquier familiar del testador con derecho a presenciar la adveración del testamento— en cuyo caso, las

---

(⁴) J. Vélez Torres, *Curso de Derecho Civil*, 2da ed., San Juan, Revista Jurídica de la Universidad Interamericana de Puerto Rico, 1992, T. IV, Vol. III, págs. 68–69.

(⁵) M. Albaladejo, *Curso de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. V, pág. 230.

(⁶) Las normas procesales no tienen vida propia. Su propósito es hacer viable la consecusión del derecho sustantivo de las partes. *Núñez González v. Jiménez Miranda*, 122 D.P.R. 134, 144 (1988).

partes podrían acudir al tribunal apelativo. A esos fines discute que

[e]l legislador aquí nos está poniendo de relieve el carácter eminentemente procesal de estas normas dictadas para el testamento ológrafo, diferenciándolas de las contenidas en la Ley de Enjuiciamiento Civil, aplicables al testamento cerrado en cuanto que, por principio, excluye los posibles recursos de reposición, apelación y queja contra el auto que afirma o deniega la protocolización; por ello reputa provisionalmente firme el auto de la decisión judicial y si existe oposición por alguno de los interesados no les reserva otro derecho que el de promover el juicio correspondiente, pero no el de interponer contra la denegación ningún recurso de carácter ordinario; cuestión íntimamente relacionada y que surge como una consecuencia de la naturaleza de jurisdicción voluntaria del expediente de protocolización, en el que no cabe, aunque exista oposición, que se convierta en contencioso; por ello, toda impugnación se tramitará por medio de un nuevo procedimiento que interpondrán los interesados en la sucesión. Tema distinto será si aquélla se refiere a posibles infracciones de procedimiento cometidas en la tramitación del expediente, en cuyo caso sí se aplicará para ella lo dispuesto en la Ley de Enjuiciamiento Civil.[7]

Ahora bien, el Art. 598 del Código de Enjuiciamiento Civil de Puerto Rico, 32 L.P.R.A. sec. 2591, dispone lo siguiente en cuanto a las acciones para determinar la validez de un testamento:

Cuando se impugnare la validez de un testamento, por haberse dejado de cumplir algunas de las formalidades exigidas por la ley o carecer el testador de capacidad para testar, aléguese o no la existencia de otro válido de fecha posterior o anterior, *podrá promoverse juicio por cualquier heredero, o por un albacea o legatario designado en el testamento cuya validez se intenta probar, al objeto de averiguar si el finado dejó testamento válido y en tal caso determinar el documento en que se halla consignada su última voluntad.* (Énfasis suplido.)

Por su parte, el inciso (e) del Art. 4.002 de la Ley de la Judicatura de Puerto Rico de 1994, *supra*, establece lo si-

---

[7] M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1990, T. IX, Vol. 1-A, pág. 482.

guiente en torno a la competencia del Tribunal de Circuito de Apelaciones para revisar resoluciones del Tribunal de Primera Instancia en casos de jurisdicción voluntaria:

> Mediante auto de *certiorari* expedido a su discreción, revisará las resoluciones finales en procedimiento[s] de jurisdicción voluntaria, dictadas por el Tribunal de Primera Instancia, incluyendo el Tribunal de Distrito durante el proceso de su abolición. En estos casos, el recurso de *certiorari* se formalizará presentando una solicitud a tales efectos dentro de los treinta (30) días siguientes al archivo en autos de copia de la notificación de la resolución. Este término es jurisdiccional.
>
> La presentación de una moción de reconsideración producirá en cuanto al término para solicitar un *certiorari* bajo este inciso, el mismo efecto provisto por las Reglas de Procedimiento Civil para los recursos de apelación. 4 L.P.R.A. sec. 22k(e).

Habida cuenta del carácter no contencioso de los procedimientos de jurisdicción voluntaria, la Regla 42.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que:

> El tribunal tendrá facultad para conocer de procedimientos de jurisdicción voluntaria, *ex parte*, que son todos aquellos en que sea necesario, o se solicite, la intervención del juez, sin estar empeñada ni promoverse cuestión alguna entre partes conocidas y determinadas, siempre que tenga jurisdicción sobre la materia.

En *Collazo, Ex Parte y Dávila, Opositora*, supra, se suscitó por primera vez la interrogante de si era o no apelable una resolución del Tribunal de Distrito de Arecibo, la cual ordenaba la protocolización de un testamento ológrafo epistolar. Allí sostuvimos que la resolución de un tribunal de distrito en la cual se acuerda o se deniega la protocolización de un testamento ológrafo no es apelable. Sobre el particular resolvimos que:

> Ni las partes han citado ni nosotros hemos podido encontrar decisión alguna de esta Corte que resuelva directamente la cuestión planteada, pero el razonamiento en el caso de *Solá v. Solá*, 30 D.P.R. 758 [(1922),] parece aplicable para sostener que

la apelación no existe.(8) *Collazo, Ex Parte y Dávila, Opositora*, supra, pág. 611.

Allí también aclaramos que, aun cuando nuestro ordenamiento no provee para que la protocolización de un testamento ológrafo sea apelable, las personas que pudieran verse afectadas por tal determinación pueden hacer valer sus derechos mediante un juicio ordinario. Así, pues, expresamos que:

> Así sucede en este caso de la protocolización. Es cierto que la medida tiene gran importancia. Ya hemos visto que por disposición expresa de la ley las copias constituirán título bastante para la inscripción, total o parcial, en el registro de la propiedad, de los bienes inmuebles en que consista la herencia, pero está limitada también expresamente por la ley al reconocimiento de la autenticidad inmediat[a] del documento, quedando a salvo los derechos de las personas a quienes pudiera perjudicar que deberán hacerlos valer en el juicio correspondiente. *Collazo, Ex Parte y Dávila, Opositora*, supra, pág. 612.

A esos mismos fines citamos a *Vázquez v. Vázquez*, 34 D.P.R. 241, 246 (1925), donde resolvimos que:

> Por otra parte, como la protocolización de un testamento ológrafo es más bien un acto de jurisdicción voluntaria y la resolución que ordenando la protocolización se dicte no produce el efecto de cosa juzgada, el derecho de los herederos forzosos que puedan existir o de las personas que se crean perjudicadas queda a salvo para recurrir al juicio ordinario.(9)

A la luz de los principios esbozados, disentimos de la opinión mayoritaria.

---

(8) Huelga indicar que en *Solá v. Solá*, 30 D.P.R. 758 (1922), dispusimos que contra una resolución que pone término a un expediente de incapacidad, no cabe recurso de apelación, no obstante el derecho de los interesados de presentar demanda ordinaria.

(9) Véase, además, *Blanch v. Registrador*, 59 D.P.R. 730, 736 (1942).

## III

En el presente caso, la recurrida impugnó ante el tribunal apelativo la idoneidad de los testigos que comparecieron a la vista de adveración de los testamentos en cuestión. Por ser ello un planteamiento sustantivo, no es revisable.

La mayoría de este Tribunal incide al concluir que, al amparo del Art. 4.002(e) de la Ley de la Judicatura de Puerto Rico de 1994, *supra*, la adveración y protocolización de un testamento ológrafo es un procedimiento de jurisdicción voluntaria revisable mediante *certiorari*. Además, incide al sostener que la aprobación de la citada ley dejó sin efecto lo resuelto en *Collazo, Ex Parte y Dávila, Opositora*, supra.

Por último, la opinión mayoritaria resuelve erróneamente que la parte que pueda verse afectada por la resolución en la cual se acepta o se deniega la protocolización de un testamento tiene dos (2) remedios, a saber: la acción ordinaria de impugnación de testamentos y el recurso discrecional de *certiorari*, al amparo del Art. 4.002(e) de la Ley de la Judicatura de Puerto Rico de 1994, *supra*. Discrepamos de dicha interpretación. Ciertamente, la adveración y orden de protocolización de un testamento ológrafo no es el tipo de procedimiento de jurisdicción voluntaria que admite revisión por un foro apelativo. El remedio disponible a la parte recurrida es el de promover la nulidad o inefectividad de los testamentos en cuestión mediante un juicio ordinario, al amparo del Art. 643 del Código Civil de Puerto Rico, *supra*.

La conclusión de la mayoría de que la Ley de la Judicatura de Puerto Rico de 1994 dejó sin efecto lo resuelto en *Collazo, Ex Parte y Dávila, Opositora*, supra, no se justifica. Del Informe Conjunto de las Comisiones de lo Jurídico Civil y de Gobierno de la Cámara de Representantes de 24 de octubre de 1995, no surge tal intención legislativa. Se trata de una ley general que no derogó expresamente lo

dispuesto en el Art. 643 del Código Civil de Puerto Rico, *supra*, ni lo resuelto en *Collazo, Ex Parte y Dávila, Opositora*, supra.

Por las razones que anteceden, disentimos de la opinión mayoritaria por entender que el Tribunal de Circuito de Apelaciones actuó sin jurisdicción al expedir el auto y ordenar la celebración de una nueva vista de adveración a la que comparezcan tres (3) testigos que conozcan tanto la letra como la firma del testador. Así, pues, resulta innecesario entrar a discutir los otros dos (2) señalamientos de error.

Por los fundamentos esbozados, revocaríamos el dictamen del Tribunal de Circuito de Apelaciones de 31 de agosto de 1998, dejando en vigor, por inapelable, la Resolución del Tribunal de Primera Instancia de 3 de abril de 1998, sin perjuicio de los derechos de la recurrida, a hacerlos valer en el juicio que corresponda.