Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| **CARLOS ANTONIO DIAZ PIFERRER SIERRA**<br>Parte recurrida<br><br>EXPARTE<br><br><br>**BARBARA DIAZ-PIFERRER MONTAÑEZ**<br>Interventora-peticionaria | TA2025CE00423 | **CERTIORARI**<br>procedente del Tribunal de Primera Instancia Sala Superior de Mayagüez<br><br>Caso Núm.:<br>**MZ2025CV00162**<br>(Salón 307)<br><br>Sobre:<br>Adveración de Testamento Ológrafo |

Panel integrado por su presidente, el Juez Sánchez Ramos, la Jueza Romero García y el Juez Pérez Ocasio.

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de septiembre de 2025.

Comparece ante nos, Bárbara Díaz-Piferrer Montañez, en adelante, Díaz-Piferrer Montañez o peticionaria, solicitando que revisemos la *"Resolución"* del Tribunal de Primera Instancia, Sala Superior de Mayagüez, en adelante, TPI-Mayagüez, el 7 de agosto de 2025. En la misma, el Foro Recurrido declaró *"Con Lugar"* la petición de Adveración del Testamento Ológrafo de Manuel Ramón Díaz-Piferrer Sierra, en adelante, Díaz-Piferrer Sierra o recurrido.

Por los fundamentos que expondremos a continuación, *expedimos y confirmamos.*

**I.**

Manuel Ramón Díaz-Piferrer Sierra, en adelante, causante, falleció el 15 de marzo de 2023.[1] El 19 de mayo de 2023, Díaz-Piferrer Montañez presentó una *"Declaración Jurada"*, junto a una petición de Declaratoria de Herederos, estableciendo que era la

---

[1] SUMAC, Entrada Núm. 1, Anejo 7.

única heredera del causante.[2] A consecución, el TPI-Mayagüez emitió una "Resolución" el 7 de junio de 2023, en la que concluyó que el causante había muerto intestado, y declaró a la peticionaria como su única y universal heredera.[3]

Ahora bien, el 28 de enero de 2025, Díaz-Piferrer Sierra presentó una *"Petición"* ante el Foro Primario.[4] En su petitorio, aduce que el causante es su hermano, y que el 19 de noviembre de 2024 encontró, entre las pertenencias del difunto, un documentos intitulado *"Testamento Personal"*, fechado el 10 de junio de 2015. Expuso que en este testamento el causante instituyó como herederos a tres (3) personas adicionales a su hija, *incluyéndolo a él.*[5] Solicitó, por lo tanto, la protocolización del testamento ológrafo suscrito por el causante. En respuesta, el 3 de febrero de 2025 la peticionaria solicitó intervenir.[6]

El 11 de febrero de 2025, el testamento ológrafo del causante fue consignado en la Secretaría del TPI-Mayagüez.[7] Posteriormente, el 14 de febrero de 2025, Díaz-Piferrer Montañez radicó ante el Foro Recurrido una *"Contestación o Posición o Intervención a Petición"*.[8] Ese mismo día, el Foro Primario concedió un término de veinte (20) días a Díaz-Piferrer Sierra para replicar a la moción de la peticionaria.[9] El 19 de febrero de 2025, el recurrido cumplió con lo ordenado.

Durante unas semanas litigando el asunto, la peticionaria presentó demanda contra coparte y reconvención, y el recurrido contestó las mismas. Sin embargo, el 6 de marzo de 2025, el TPI-Mayagüez declaró *"No Ha Lugar"* la demanda contra coparte y

---

[2] SUMAC, Entrada Núm. 1, Anejo 3.
[3] SUMAC, Entrada Núm. 1, Anejo 1.
[4] SUMAC, Entrada Núm. 1.
[5] SUMAC, Entrada Núm. 1, Anejo 5.
[6] SUMAC, Entrada Núm. 2.
[7] SUMAC, Entrada Núm, 10.
[8] SUMAC, Entrada Núm. 11.
[9] SUMAC, Entrada Núm. 12.

reconvención, advirtiéndole a la peticionaria que este era un asunto ex parte no adversativo, limitado a la adveración y protocolización del testamento en cuestión.[10] Además, concedió a Díaz-Piferrer Sierra un término de diez (10) días para anunciar los testigos que utilizaría en la vista en su fondo, anunciar un perito y notario público.[11]

El 12 de marzo de 2025, Díaz-Piferrer Sierra anunció mediante *"Moción en Cumplimiento de Orden"* los testigos, el perito y el notario público para la vista en su fondo.[12] El 20 de marzo de 2025, el TPI-Mayagüez autorizó al perito anunciado por el recurrido a examinar el testamento ológrafo del causante.[13]

Por otro lado, el 3 de abril de 2025, la peticionaria radicó una *"Moción a Tenor con el Artículo 1653 del Código Civil"*, en la que adujo que el recurrido no cumplió con los treinta (30) días que la Ley dispone para presentar un testamento ológrafo al Tribunal.[14] Por su parte, el recurrido presentó ante el TPI-Mayagüez el *"Informe Pericial Caligráfico"* de su perito, el 16 de abril de 2025.

El 25 de abril de 2025, el Foro Primario señaló el Juicio en su Fondo para el 9 de julio de 2025, e impartió unas instrucciones al respecto.[15] Llegado el día para el juicio, ambas partes comparecieron. Entre las cosas discutidas, las partes argumentaron con respecto al alegado incumplimiento de los treinta (30) días para la presentación del testamento.[16] Sin embargo, la vista fue reseñalada para el 1 de agosto de 2025.[17]

En la vista final del juicio, se le dio lectura al testamento ológrafo del causante, se escucharon los testimonios de los testigos

---

[10] SUMAC, Entrada Núm. 19.
[11] SUMAC, Entrada Núm. 18.
[12] SUMAC, Entrada Núm. 20.
[13] SUMAC, Entrada Núm. 21.
[14] SUMAC, Entrada Núm. 25.
[15] SUMAC, Entrada Núm. 30.
[16] SUMAC, Entrada Núm. 40.
[17] SUMAC, Entrada Núm. 40.

del recurrido y de su perito.[18] La fiscal que formó parte de los procedimientos, expresó conformidad con el cumplimiento de las formalidades requeridas para un testamento ológrafo. Sin embargo, señaló que su única preocupación versaba sobre el posible incumplimiento con los treinta (30) días requeridos para que *el custodio* de un testamento ológrafo lo presente al Tribunal.

Por su parte, la representación legal del recurrido admitió que Díaz-Piferrer Sierra se tardó más de treinta (30) días en presentar el mismo, pero que eso no tenía el efecto de invalidar el testamento. Además, subrayó que el mismo cuerpo normativo que establece esto, dispone que los testamentos ológrafos tienen un término de caducidad de cinco (5) años. Así, una vez argumentado el asunto por las partes, el caso quedó sometido a la consideración del Foro Primario.

Finalmente, el 7 de agosto de 2025, el TPI-Mayagüez emitió una *"Resolución"* en la que declaró *"Con Lugar"* la petición de adveración del testamento en controversia.[19] Inconforme con ello, la peticionaria recurrió ante esta Curia mediante una *"Petición de Certiorari"*, en la que expuso el siguiente señalamiento de error:

> **Erró el Tribunal de Primera Instancia, Sala Superior de Mayagüez, Honorable Tomas Báez Collado, Juez Superior, al declarar Con Lugar la Petición de Adveración del testamento ológrafo en cuestión, a pesar de no cumplir con el Art. 1653 del Código Civil.**

El 10 de septiembre de 2025, emitimos una *"Resolución"*, concediéndole a la parte recurrida hasta el 18 de septiembre de 2025 para presentar su posición en cuanto al recurso. Así, el 15 de septiembre de 2025, Díaz-Piferrer Sierra presentó ante nos su *"Oposición a la Expedición del Auto de Certiorari"*.

Perfeccionado el recurso de marras, procedemos a resolver.

---

[18] SUMAC, Entrada Núm. 41.
[19] SUMAC, Entrada Núm. 42.

## II.

### A. Certiorari

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023); *Torres González v. Zaragoza Meléndez,* 211 DPR 821, 846-847 (2023); *Caribbean Orthopedics v. Medshape et al.,* 207 DPR 994, 1004 (2021); *800 Ponce de León v. AIG,* 205 DPR 163, 174-175 (2020).

Por su parte, cuando la controversia se produce en procesos de *jurisdicción voluntaria*, la determinación final del Tribunal de Primera Instancia también puede ser recurrida mediante recurso de *certiorari*. Así, la Regla 32(c) de nuestro Reglamento, 4 LPRA Ap. XXII-B, R. 32, dispone que el mismo "se formalizará mediante la presentación de una solicitud dentro de los treinta (30) días siguientes a la fecha de archivo en autos de una copia de la notificación de la resolución u orden recurrida. Este término es jurisdiccional".

Por otro lado, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, dispone lo siguiente:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A)    Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B)    Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C)    Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D)    Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E)    Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.

(F)    Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G)    Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

*In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, *supra*, 215 DPR ___ (2025); *BPPR v. Gómez-López*, 213 DPR 314, 337 (2023).

Nuestro Tribunal Supremo ha expresado que, de ordinario, el tribunal revisor "no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o *que se equivocó en la interpretación o aplicación* de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial". *W.M.M., P.F.M. et al. v. Colegio,* 211 DPR 871, 902-903 (2023); *Pueblo v. Custodio Colón,* 192 DPR 567, 589 (2015); *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000); *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992), citando a *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). (Énfasis suplido).

### B. La Sucesión Testada e Intestada

Existen varios tipos de transmisión sucesoria, a saber, la testamentaria, la intestada y la mixta. Artículo 1548 del Código Civil de Puerto Rico de 2020, en adelante, Código Civil de 2020, 31 LPRA sec. 10913. La *sucesión intestada* es aquella que establece la ley para cuando no existen o no rigen disposiciones testamentarias. Artículo 1550 del Código Civil de 2020, *supra*, sec. 10915. Es decir, la sucesión intestada es un conjunto de normas que reglamentan la distribución del caudal hereditario de una

persona que fallece sin testamento, o bien con un testamento que es total o parcialmente ineficaz. E. González Tejera, *Derecho de Sucesiones: La sucesión intestada*, Editorial Universidad de Puerto Rico, 2001, T. I, pág. 52. El Título V de nuestro Código Civil actual regula la sucesión intestada.

Ahora bien, la disposición estatutaria al respecto nos instruye que para darle apertura a la sucesión intestada tiene que ocurrir alguno de las siguientes instancias: "cuando el causante **muere *sin hacer testamento***, o cuando el **testamento es *ineficaz* o *insuficiente***". Artículo 1719 del Código Civil de 2020, supra, sec. 11431. (Énfasis suplido). Es decir, solo procede la sucesión intestada cuando el causante no otorgó testamento; o habiéndolo otorgado, el testador incumplió con las solemnidades requeridas por Ley al momento de manifestar su voluntad, o no dispuso completa o correctamente de su caudal. *Deliz et als. v. Igartúa et als,* 158 DPR 403, 415 (2003); Ossorio Morales, *Manual de Sucesión Testada*, Madrid, Ed. Inst. Estudios Políticos, 1957, pág. 466.

Por otro lado, *la sucesión testamentaria* es la que resulta de la voluntad declarada en un testamento. Artículo 1549 del Código Civil de 2020, supra, sec. 10914. La institución de herederos es la designación hecha en un testamento de la persona que sucederá al testador, como heredero o como legatario, en la titularidad de los bienes que integran la herencia. Artículo 1659 del Código Civil de 2020, supra, sec. 11301. Mediante el testamento, el testador puede ordenar, no sólo la manera de distribuir su patrimonio relicto, sino también designar quienes habrán de ser los destinatarios de los bienes y las obligaciones que lo componen. E. González Tejera, op. cit., págs. 51-52. El cuerpo normativo que rige estos asuntos dispone que existen tres (3) tipos de testamentos, a saber, el abierto, *el ológrafo* y los testamentos especiales. Artículo 1643 del Código Civil de 2020, supra, sec. 11261.

Ahora bien, cuando un testamento es parcialmente ineficaz, nos encontramos ante una sucesión mixta, es decir, la que resulta de la voluntad declarada en un testamento y, a la vez, de las disposiciones pertinentes de ley. Arts. 1551 y 1719 del Código Civil, 31 LPRA secs. 10916 y 11431.

### C. Testamentos Ológrafos

El testamento "es el acto por el cual manifestamos nuestra última voluntad para que ésta sea cumplida después de la muerte". G. Velázquez, citando a Modestino, *Teoría del Derecho Sucesorio Puertorriqueño*, 2d ed. rev., San Juan, Ed. Equity de Puerto Rico, 1968, pág. 161. Aunque ahora los testamentos pueden ser públicos, privados o mixtos, en los tiempos de antigüedad, solo se reconocía el testamento público. *In Re De la Texera Barnes*, 117 DPR 468, 477 (2009). No fue hasta la creación de Leyes de las XII Tablas, que instituyeron el primer Código legal de la antigua Roma, que se reconoció el testamento privado.

En nuestro actual estado de derecho, *el testamento ológrafo* es, en efecto, un testamento de naturaleza privada, mediante el cual un individuo puede plasmar su voluntad *post mortem*. A grandes rasgos, nuestro Código Civil de 2020, supra, lo define y circunscribe sus requisitos de la siguiente manera:

> El testamento ológrafo es el autógrafo, fechado y firmado por el propio testador. El testador debe salvar con su firma las palabras tachadas, enmendadas o entre renglones que contenga el documento. Si no lo hace, las tachaduras, enmiendas o entrerrenglonaduras se tienen por no escritas. Lo añadido bajo la firma se tiene por no puesto salvo que el testador lo vuelva a fechar y lo firme.

Artículo 1650 del Código Civil de 2020, supra, sec. 11281.

Según González Tejera, uno de los propósito que inspiran esta categoría testamentaria es "mantener secreto, a discreción del testador, tanto el hecho del otorgamiento como su contenido". E.

González Tejera, *Derecho de Sucesiones,* San Juan, E.D.U.P.R., 2002, T. II, pág. 163. Esto, ya que el mismo no requiere la presencia de un notario. "La comodidad del testamento ológrafo reside en el poder de hacer un acto de última voluntad sin tener que recurrir a los servicios de un notario o de otro funcionario". *In Re De la Texera Barnes,* supra, pág. 477.

Ahora bien, para que el mismo sea válido *mortis causa,* nuestro ordenamiento jurídico requiere que el mismo sea sometido a un proceso de adveración y protocolización.

### D. Procedimiento de Adveración y Protocolización de Testamento Ológrafo

La palabra *adveración* se refiere al proceso de autenticar el documento que conforma el testamento ológrafo. Ruth E. Ortega-Vélez, *Lo que toda persona debe saber sobre… Donaciones, Herencias y Testamentos,* Ediciones SITUM, 2017, pág. 111. La adveración precede a la protocolización. Este último es el proceso de jurisdicción voluntaria, mediante el cual un Tribunal que entiende justificada la autenticidad de un testamento, le otorga la efectividad de un documento público al mismo. José R. Vélez Torres, *Derecho de Sucesiones,* Tomo VI, Vol. III, 1997, pág. 66.

Resulta menester apuntalar que la adveración y protocolización de un testamento ológrafo es un proceso no adversativo, de jurisdicción voluntaria, que no tiene el efecto de cosa juzgada. Luego de que un Tribunal autentique el testamento, y autorice la protocolización del mismo, quien desee impugnarlo, deberá así hacerlo a través de un proceso ordinario. *Ab Intestato Lugo Rodríguez,* 151 DPR 579, 587-588 (2000).

En el proceso de adveración se examina, no solamente que la autoría sea exclusiva del testador, sino que el documento refleje la forma en que el causante usualmente escribía. Por tal razón, toda

forma mecánica de escritura está necesariamente excluida. Se ha establecido que el referido proceso no admite que se utilice "la escritura a máquina, ni otro medio mecánico, ni instrumento alguno de reproducción aunque sea de la escritura de puño y letra del testador (fotocopia, xerocopia y otros)." L. Roca–Sastre Muncunill, *Derecho De Sucesiones,* Bosch Casa Editorial, 1995, T. 1, pág. 165; Puig Brutau, *Fundamentos de Derecho Civil,* Tomo V, Vol. II, Barcelona, (1977), pág. 121.

Por su parte, el Código de Enjuiciamiento Civil ofrece una serie más extensa de directrices específicas para la adveración y eventual protocolización del testamento ológrafo. En su primer inciso, el artículo en cuestión dispone sobre el proceder, luego de la presentación y evidencia de la muerte del causante, de la siguiente manera:

> Presentado el testamento ológrafo y acreditado el fallecimiento del testador, el Tribunal de Primera Instancia procederá a su lectura en audiencia pública y en día y hora señalados al efecto, dentro del segundo día a más tardar, abriéndolo si estuviere en pliego cerrado, rubricándolo los jueces con el notario en todas las hojas y comprobando acto continuo su identidad por medio de tres (3) testigos que conozcan la letra y firma del testador y declaren que no abrigan duda racional del hallarse el testamento escrito y firmado de mano propia del mismo. A falta de testigos idóneos, o si dudan los examinados, y siempre que el Tribunal de Primera Instancia lo estime conveniente, podrá emplearse con dicho objeto el cotejo pericial de letras.
>
> Artículo 551A(1) del Código de Enjuiciamiento Civil, 32 LPRA 2280a.

Finalmente, por ser relevante al caso de marras, distinguimos lo siguiente del proceso de adveración, el cual está regulado por el Artículo 1653 de Nuestro Código Civil de 2020, supra, sec. 11284 y el Artículo 551A del Código de Enjuiciamiento Civil de Puerto Rico de 1933, supra, sec. 2280a. Por tratarse la controversia de epígrafe

sobre el Código Civil de 2020, supra, transcribimos a continuación la disposición estatutaria al respecto:

> La persona **que tiene en su poder** un testamento ológrafo está obligada a presentarlo en el tribunal o a un notario para su adveración, dentro de los treinta (30) días desde que tiene noticia de la muerte del testador. También puede presentarlo cualquier persona que tiene un interés legítimo en el testamento. Una vez concluye el procedimiento de adveración, el testamento ológrafo debe protocolizarse para que sea eficaz.
>
> Artículo 1653 del Código Civil de 2020, supra, sec. 11284. (Énfasis suplido).

Por otro lado, nos advierte el cuerpo normativo en cuestión que "[e]l testamento ológrafo caduca si no se presenta para su adveración dentro del plazo de cinco (5) años desde el día del fallecimiento del testador". Artículo 1654 del Código Civil de 2020, supra, sec. 11285.

Ahora bien, en un ejercicio exegético, veamos brevemente qué disponía el Código Civil derogado al respecto del proceso de adveración. El anterior Código esbozaba que el que tuviera en su poder un testamento ológrafo, en lugar de treinta (30) días, disponía de diez (10) días para presentarlo ante el Tribunal. Artículo 640 del Código Civil de 1930, 32 LPRA ant. sec. 2164. No obstante, este derogado cuerpo normativo no estableció un término prescriptivo ni de caducidad para la presentación de un testamento ológrafo al Tribunal. A estos efectos, nos comenta un tratadista que "[a]l depositario se le asigna un término de 10 días para cumplir con su deber. Los que no tienen deber de hacerlo, por no ser depositarios […] no tienen plazo fijado para actuar". Efraín González Tejera, *La sucesión testamentaria*, Tomo II, 2002, pág. 149.

El proceso de adveración de un testamento ológrafo no cambió de un Código al otro, con minúsculas excepciones. Como vimos, dos (2) de las más importantes distinciones es el término de diez (10)

para que el depositario presente el mismo al Tribunal, y la falta de un término de caducidad para el testamento como documento privado. Si armonizamos lo esbozado por el tratadista González Tejera al Código actual, estamos persuadidos a interpretar que la persona a quien se le haya depositado un testamento ológrafo tiene treinta (30) días para presentarlo al Tribunal, y aquel con un interés sobre el mismo, que no sea depositario, tiene un término de caducidad de cinco (5) años para presentarlo ante el Tribunal.

**III.**

La peticionaria recurre ante nos arguyendo que el TPI-Mayagüez erró al declarar *"Con Lugar"* la petición de adveración de testamento del recurrido. Aduce que se incumplió con lo requerido en el Artículo 1653 del Código Civil de 2020, supra, sec. 11284. Esto, ya que Díaz-Piferrer Sierra no presentó el testamento ológrafo ante el Foro Primario dentro de los treinta (30) días requeridos. *No le asiste la razón.*

Como explicáramos previamente, el proceso de adveración es una asunto no contencioso, de jurisdicción voluntaria, que no surte efecto de cosa juzgada. En el proceso de adveración, está ante la consideración del Foro Primario únicamente la autenticidad del mismo. Del expediente surge que la prueba aquilatada por el Foro Recurrido para la adveración del testamento no admitía justa causa para denegarlo. El recurrido presentó evidencia de la muerte del testador, anunció y utilizó en la vista un perito que fue calificado sin objeción de la peticionaria. En el informe de este, surge que en efecto el mismo contenía la voluntad del causante, por su puño y letra. El Foro Primario también escuchó el testimonio de tres (3) testigos. De esta prueba, la peticionaria nada dispuso para impugnarla. Es decir, no encontramos razón en derecho que nos mueva a interpretar de

otra manera la conclusión a la que llegó el TPI-Mayagüez, sobre la autenticidad del testamento.

Con relación a los treinta (30) días dispuestos en el Código Civil de 2020, supra, somos de la interpretación que este término es de aplicación únicamente al *depositario* de un testamento ológrafo. El recurrido informó al Foro Recurrido, sin objeción de la peticionaria, que este había encontrado el testamento ológrafo un tiempo después de la muerte del causante. Es decir, su posición es que no era depositario del mismo, y esto creyó el TPI-Mayagüez. Concluimos, por lo tanto, que Díaz-Piferrer no tenía un término de treinta (30) días para presentar el testamento al Tribunal. Este solo está ceñido a un término de caducidad de cinco (5) años, que al momento de presentar la petición de adveración, aún no había transcurrido.

Por último, la peticionaria entiende que el caudal relicto del causante debe dilucidarse bajo la sucesión intestada, en la cual ella es la única y universal heredera. Sin embargo, como vimos, la sucesión intestada solo puede tener apertura cuando no exista testamento, o si existiendo, este resulta insuficiente o ineficaz. En el caso de marras, sí existe un testamento ológrafo, con la última voluntad del causante. Este documento fue sometido a los proceso de rigor, conforme a derecho y exitosamente. Al quedar autenticado, procede, en efecto, la protocolización del mismo.

**IV.**

Por los fundamentos antes expuestos, *expedimos el recurso y confirmamos el dictamen recurrido.*

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones